Dan COHEN, Respondent (C8–88–2631), Respondent (C0–88–2672),

v.

COWLES MEDIA COMPANY, d/b/a Minneapolis Star and Tribune Company, Appellant (C8–88–2631), Defendant (C0–88–2672),

Northwest Publications, Inc., Defendant (C8–88–2631), Appellant (C0–88–2672).

Nos. C8–88–2631, C0–88–2672.

Court of Appeals of Minnesota.

Sept. 5, 1989.

Elliot C. Rothenberg, Minneapolis, for Dan Cohen.

James Fitzmaurice, John Borger, Andrew S. Dunne, Faegre & Benson, Patricia A. Longstaff (Norton L. Armour, Cowles Media Co., of counsel), Minneapolis, for Cowles Media Co., d/b/a Minneapolis Star and Tribune Co.

Paul R. Hannah, St. Paul (Richard J. Ovelmen, Landon K. Clayman, Baker & McKenzie, Miami, Fla., of counsel), for Northwest Publications, Inc.

Heard, considered and decided by SHORT, P.J., and CRIPPEN and SCHULTZ,* JJ.

## OPINION

SHORT, Judge.

Cowles Media Company, d/b/a Minneapolis Star and Tribune (Tribune) and Northwest Publications, Inc. (Dispatch), appeal the trial court's judgment awarding Cohen $200,000 in compensatory damages and $500,000 in punitive damages. This action arises out of the newspapers' publication of Cohen's name after reporters employed by the newspapers had promised Cohen that his name would not be published. The trial court concluded that the first amendment did not bar Cohen's breach of contract and misrepresentation claims and submitted those claims to the jury. The jury returned a verdict in favor of Cohen. The trial court denied the newspapers' alternative motions for judgment notwithstanding the verdict and a new trial. On

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

appeal, the newspapers argue that the trial court erred in (1) ignoring the protection afforded the press by the first amendment, (2) instructing the jury with respect to Cohen's contract claim, (3) submitting the issue of fraud to the jury, (4) submitting the issue of punitive damages to the jury, and (5) admitting irrelevant and prejudicial evidence regarding other Tribune publications. We affirm the judgment on the breach of contract claim, but reverse as to the claims for misrepresentation and punitive damages.

### FACTS

In the fall of 1983, respondent Dan Cohen was the director of public relations for an advertising agency. That agency was handling the advertising for the campaign of Wheelock Whitney, the Independent Republican (IR) gubernatorial candidate. Cohen was a long-time and well-known IR supporter. One week before the gubernatorial elections, Gary Flakne, a former IR legislator and county attorney, unearthed documents which demonstrated that the Democratic–Farmer–Labor (DFL) candidate for lieutenant governor, Marlene Johnson, had been arrested in 1969 for unlawful assembly (that charge was later dropped) and arrested and convicted of petty theft in 1970 (that conviction was vacated in 1971). Flakne scheduled a meeting with several IR supporters for October 27 to discuss release of these documents to the media. Cohen attended this meeting.

At the meeting, the group decided that Cohen should be the person to release the documents because he had the best rapport with the local media. The group further discussed and agreed that Cohen should retain anonymity in releasing the information. Cohen immediately contacted four journalists: Lori Sturdevant of the Tribune; Bill Salisbury of the Dispatch; Gerry Nelson of the Associated Press; and David Nimmer of WCCO Television. He reached all but Nimmer by telephone and said:

I have some material which may or may not relate to the upcoming statewide election. And assuming that we can reach an agreement as to the basis on which I would provide this material to you, I will provide it.

All three reporters agreed to meet with him.

Later that morning, Cohen met separately with Sturdevant and Salisbury in the State Capitol building news office. He made the following proposal to each reporter.

I have some documents which may or may not relate to a candidate in the upcoming election, and if you will give me a promise of confidentiality, that is that I will be treated as an anonymous source, that my name will not appear in any material in connection with this, and that you will also agree that you're not going to pursue with me a question of who my source is, then I will furnish you with the documents.

Sturdevant promptly and unequivocally agreed to Cohen's proposal. Cohen then gave her copies of the documents, and she allegedly said, "This is the sort of thing that I'd like to have you bring by again if you ever have anything like it." Sturdevant then asked Cohen if she had this information on an exclusive basis. Cohen said "No." Sturdevant did not protest or express any dissatisfaction with this nonexclusive arrangement.

Salisbury also agreed immediately to Cohen's proposal regarding anonymity. After reviewing the papers Cohen had given him, Salisbury described them as "political dynamite." The issue of exclusivity was never discussed between Cohen and Salisbury.

Cohen then met separately with Nelson and Nimmer. The same proposal was made to each reporter and was accepted by each. After securing the promise of confidentiality, Cohen delivered the documents.

Thereafter, Cohen returned to work and informed his supervisor that he had supplied the documents to the media. Cohen testified that his supervisor had no reaction as to his disclosure. The supervisor, however, testified at trial that he was upset by what he believed were Cohen's unscrupulous practices.

Sturdevant immediately reported the information she had received from Cohen to her supervisor. The Tribune editors assigned four or five reporters to follow up on the story and to contact members of the two gubernatorial campaigns. A reporter, who was directed to verify the authenticity of the court records, discovered Gary Flakne's name on the list of persons having recently reviewed the records. The reporter contacted Flakne and asked Flakne for whom he had obtained those documents. Flakne told the reporter that he had obtained the documents for Cohen.

The Tribune editor who had the ultimate say in whether to run the story convened a "huddle" sometime around 3:00 p.m. to discuss the handling of the information. That group decided that if the Tribune did not run the story, the paper could be accused of suppressing information damaging to the DFL party. They also discussed simply publishing the information on the arrest and conviction and honoring the promise to Cohen. The group considered it unsatisfactory to describe the source as a Whitney supporter, a Whitney campaign member, or a prominent Independent Republican. The Tribune had never before dishonored a reporter-source agreement.

Sturdevant, who was not a part of the "huddle" and had no other input into whether the story was reported, was asked by her editors to see whether Cohen would release the Tribune from its promise of anonymity. Sturdevant expressed her adamant objection to dishonoring the promise to Cohen and she demanded that her name not appear on the article should it be published. She nevertheless agreed to write the article and to ask Cohen to release the Tribune from its promise. She telephoned Cohen two or three times, but each time Cohen refused to agree to have his name published. Finally, the Tribune decided to run the story disclosing Cohen's identity. Sturdevant then contacted Cohen to inform him of the situation and he said if his name was to be published, he wanted to make the following statement:

The voters of this state are entitled to know that kind of information. Every day Perpich and Johnson failed to reveal it to them, they were living a lie.

On October 28, 1982, the Tribune ran an article appearing on the bottom half of the front page, entitled "Marlene Johnson Arrests Disclosed by Whitney Ally." Pursuant to Sturdevant's demand, the article was attributed to "Staff Writer." The article disclosed Johnson's arrests and conviction, and named Cohen as the source of the information. The article also revealed that Cohen was employed by the agency handling the advertising for the IR gubernatorial campaign. The article did not mention Sturdevant's promise of anonymity to Cohen.

In contrast to the manner in which the Tribune handled the matter, the Dispatch editors did not engage in involved deliberations before deciding to disclose Cohen's identity. Salisbury also objected to dishonoring his promise to Cohen. However, he did not object to his name appearing on the article. The Dispatch ran an article similar to the Tribune's in both Dispatch editions on October 28. The articles appeared in the local news sections, disclosed the convictions and arrests, and identified Cohen as the source. This occasion was the first time that the Dispatch had dishonored a reporter's promise to keep a source confidential. While the articles stated that Cohen asked that his name not be used, they failed to disclose that a Dispatch reporter had promised to keep Cohen's name confidential. Unlike the Tribune article, however, the Dispatch articles did not mention the name of Cohen's employer.

The Associated Press honored its reporter's promise to Cohen by stating that court documents relating to the arrests and conviction "were slipped to reporters." WCCO–TV also honored its reporter's promise by deciding not to broadcast the story at all.

Later in the day on October 28, after learning that Cohen's name and employment had been published in connection with the story, Cohen's employer confronted him and a heated discussion ensued. According to Cohen, that discussion ended with his being fired. According to Cohen's employ-

er, Cohen resigned. The newspapers do not now dispute that Cohen was fired or otherwise forced to resign as a result of the story.

On October 29, the Tribune published a column criticizing Cohen for his self-righteousness and unfair campaign tactics. On October 30, the Tribune ran an editorial cartoon depicting a trick-or-treater outfitted as a garbage can knocking on the door of the DFL headquarters. The garbage can was labeled "Last minute campaign smears," and governor Rudy Perpich was opening the door, stating, "It's Dan Cohen."

Sometime during the week beginning October 31, Flakne wrote to the editor of the Dispatch criticizing both newspapers for their breach of the reporter-source agreement with Cohen. On November 7, four days after the election, the Dispatch printed Flakne's letter on its editorial page. That same day, the Tribune ran a more edited version of Flakne's letter along with an article explaining why the newspaper had overridden its reporter's promise to Cohen.

Cohen subsequently commenced this breach of contract and misrepresentation action, seeking both compensatory and punitive damages. The jury found that both newspapers had entered into binding contracts with Cohen and that they breached those contracts. The jury further found that both newspapers made material misrepresentations of fact to Cohen. The jury awarded Cohen $200,000 in compensatory damages and $500,000 in punitive damages.

The newspapers alternatively moved for judgment notwithstanding the verdict or a new trial, alleging numerous trial court errors. The trial court denied these motions and entered judgment. The Tribune and the Dispatch separately appealed the judgment, and we consolidated the appeals.

## ISSUES

I. Did the trial court err in concluding that the first amendment does not bar an action for breach of contract against the newspapers for their dis-closure of Cohen's name, even though such disclosure was truthful and newsworthy?

II. Did the trial court err in instructing the jury with respect to Cohen's contract claim?

III. Did the trial court err in denying the newspapers' motions for judgment notwithstanding the verdict on the misrepresentation claim?

IV. Did the trial court err in submitting the issue of punitive damages to the jury?

V. Did the trial court commit reversible error in admitting other Tribune publications into evidence?

## ANALYSIS

### I.

The trial court correctly concluded that the first amendment does not bar Cohen's contract claim. There is no state action, the alleged first amendment rights do not outweigh the governmental interests, and the newspapers knowingly waived their first amendment rights.

### A. State Action

■ We believe that there is no state action present in this case to trigger first amendment scrutiny. The first amendment prohibits the government from making laws "abridging the freedom of speech, or of the press." U.S. Const. Amend. I. The first amendment bars only government action that restricts free speech or press freedom. *Public Utilities Commission of District of Columbia v. Pollak*, 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952).

■ The United States Supreme Court has repeatedly held in a variety of contexts that the neutral application of state laws is not state action. *See Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, ——, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988) (private use of state sanctioned private remedies or procedures does not rise to level of state action); *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 163, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185 (1978) (action pursuant to state law is not state

action); *Evans v. Abney,* 396 U.S. 435, 446, 90 S.Ct. 628, 634, 24 L.Ed.2d 634 (1970) (operation of neutral and nondiscriminatory state trust laws does not constitute state action). The decisions of other federal courts are in accord. *See Peters v. United States,* 694 F.2d 687, 697 (Fed.Cir.1982) (modification of contract to which government is a party is not state action); *Warren v. Government National Mortgage Association,* 611 F.2d 1229, 1234 (8th Cir. 1980) (extrajudicial foreclosure pursuant to power of sale terms of the deed of trust performed in accordance with state law is not state action), *cert. denied,* 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980); *Doe v. Keane,* 658 F.Supp. 216, 220–21 (W.D.Mich. 1987) (exercise of a choice allowed by state law, where initiative comes from private actor and not from state, cannot make private act a state act); *Price v. International Union, United Automobile Aerospace & Agricultural Implement Workers of America,* 621 F.Supp. 1243, 1250 (D.Conn. 1985) (court intervention is possible in any suit on a contract and does not in itself constitute state action merely because free speech may be curtailed); *International Society for Krishna Consciousness, Inc. v. Reber,* 454 F.Supp. 1385, 1388–89 (C.D.Cal. 1978) (use of state trespass laws to enforce private property rights is not state action). Only when private parties make use of state procedures with the overt, significant assistance of state officials, has the United States Supreme Court found state action to be present. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

We do not doubt that court action can constitute state action in some circumstances. In *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the Supreme Court held state enforcement of a racially restrictive covenant was state action prohibited by the fourteenth amendment. In that case, third parties, aided by the courts, were preventing the sale of real property by enforcing racially restrictive covenants. *Id.* at 18, 68 S.Ct. at 844. Under these circumstances, the state courts' conduct was "active intervention." *Id.* at 19, 68 S.Ct. at 845. By actively perpetu-ating the denial of black people's property rights, the courts were defeating the basic objective of the fourteenth amendment.

Although the language of *Shelley* is expansive, we believe it does not stand for the proposition that application of neutral common law rules is always state action. The Supreme Court held in *Evans,* for example, that "the operation of neutral and nondiscriminatory state trust laws" did not constitute state action for purposes of the fourteenth amendment. 396 U.S. at 446, 90 S.Ct. at 634. In *Evans,* the alleged state action was the application of neutral rules of construction designed to determine the intent of the testator. The Court held that such action does not violate the fourteenth amendment. *Id.*

Thus, the issue this court faces is whether the application of neutral principles of contract law to a promise not to publish the source of information is state action which triggers first amendment scrutiny. We believe the rule in *Evans* more closely fits our situation, and therefore hold no state action is present. The court here was not engaging in "active intervention" at the request of third parties, as was the case in *Shelley.* Rather, the parties themselves made the agreement without involvement by the state. The enforcement of the contract is not impermissible state involvement in the denial of a constitutional right. Rather, the state is enforcing an agreement between private parties who have bargained for the content of published information. In these circumstances, the parties' agreement, even with ultimate state enforcement, is not deserving of first amendment scrutiny.

The Supreme Court held in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that application of state defamation law to a newspaper was state action. *Id.* at 265, 84 S.Ct. at 718. We believe the rule in *New York Times* has little relevance to an action brought under contract law. Defamation law inherently limits the content of speech. Speech which meets the elements of the defamation tort and the malice requirements of *New York Times* may be sanc-

tioned by damage awards enforced by the courts. Contract law is, we believe, fundamentally different. The rules of contract law do not sanction any particular speech. The parties themselves chose the speech or conduct they wished to be the subject matter of the contract. An award of contract damages, therefore, does not sanction the words or conduct themselves, but rather the failure to honor a promise. Because the action of the court is not suppression of speech, it is not state action of the type at issue in *New York Times*. Thus, we conclude that the application of neutral contract principles to a private party's agreement to suppress speech is not state action, and does not require first amendment scrutiny.

### B.  *Weighing of Competing Interests*

▪ Assuming that this civil contract suit may nonetheless constitute state action, the first amendment still did not relieve the newspapers of the obligation they had to honor the terms of their contract with Cohen. The United States Supreme Court has adopted a balancing test to determine whether official action which has adverse or chilling effects on speech violates the first amendment. *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 582, 103 S.Ct. 1365, 1370, 75 L.Ed.2d 295 (1983); *Branzburg v. Hayes*, 408 U.S. 665, 680–81, 92 S.Ct. 2646, 2656–57, 33 L.Ed.2d 626 (1972). A burden on first amendment rights is justified only if necessary to achieve an overriding governmental interest. *Minneapolis Star & Tribune Co.*, 460 U.S. at 582, 103 S.Ct. at 1370.

▪ The Supreme Court has found a variety of permissible burdens on the press. For example, the first amendment does not invalidate the application of civil or criminal laws to members of the press despite the burden on press freedom which their application may impose. *Branzburg*, 408 U.S. at 682–83, 92 S.Ct. at 2657–58. Newspapers have no special immunity from the application of general laws, nor do they have a special privilege to invade the rights and liberties of others. *Id.; Associated Press v. NLRB*, 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953 (1937); *Galella v. Onassis*, 487 F.2d 986, 995 (2nd Cir.1973). News organizations are not exempt from federal labor laws, *see Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 192–93, 66 S.Ct. 494, 497–98, 90 L.Ed. 614 (1946), or from nondiscriminatory forms of general taxation. *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). State and federal governments can subject newspapers to generally applicable economic regulations without violating the first amendment. *Minneapolis Star & Tribune Co.*, 460 U.S. at 581, 103 S.Ct. at 1369.

▪ The press also is not free to publish with impunity everything it desires to publish, nor does it have a constitutional guarantee of access to information not available to the public generally. *Branzburg*, 408 U.S. at 683–84, 92 S.Ct. at 2657–58. Consequently, the first amendment permits the media's access to grand jury proceedings, judicial conferences, meetings of other official bodies in executive sessions, disaster scenes, or criminal trials to be restricted in some circumstances. *Id.* at 684–85, 92 S.Ct. at 2658–59. *See also Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570 (1978) (first amendment generally grants press no greater right to information about trial than that of the general public).

▪ It is apparent from these and other federal cases that news organizations cannot rely on the first amendment to shield themselves from criminal or civil liability simply because the acts giving rise to such liability were taken while in pursuit of newsworthy information. It is even more apparent that news organizations are not exempt from liability when they breach contracts entered into for the very purpose of gathering the news.

▪ The governmental interest in allowing the civil damage award in the instant case outweighs the intrusion on press freedom. The government has an interest in protecting the expectations of a person

who freely enters into a contract in reliance on the court's power to remedy any damage he or she might suffer should the other party fail to perform.

The protection of contractual rights has been found to be a compelling state interest in another context. *See Duluth Lumber & Plywood Co. v. Delta Development, Inc.*, 281 N.W.2d 377, 381–83 (Minn.1979) (holding state has compelling interest in applying its contract law to a civil dispute involving the Chippewa Tribe). The United States Supreme Court has implicitly found the protection of contractual rights to be a sufficient governmental interest to outweigh first amendment rights. *Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam) (where both majority and dissenting opinions agreed contractual remedies were appropriate to enforce a contract to suppress speech).

We find no reason to provide less protection to the reasonable expectations of a newspaper informant than we would to any other party to whom the newspaper makes a promise. Surely, the newspapers would not suggest they are immune to ordinary commercial contracts for goods and services. Yet the newspapers maintain that an agreement with a news source is exempt from the law of contracts. We disagree. The agreement to provide information, like any other service, is an appropriate subject matter for the law of contracts.

Balanced against the clear interest of the state to impartially protect the sanctity of contracts is the alleged burden contract law places upon the press. The newspapers argue the newsworthiness of Cohen's name is enough to outweigh the state's interest in enforcing the contract. We disagree. The newspapers had an interest in providing information relating to the credibility and motivations of the source, but not necessarily in providing Cohen's name. Reporting that the source was aligned with the IR party in some manner would have satisfied the need to describe the source.

The newspapers argue that the government has no interest in allowing a civil damage award because the contract itself is invalid. The newspapers claim that only the journalist, and not the source, has a right to enforce a confidentiality agreement. The newspapers have failed to cite any case law which suggests that a source has no right to enforce a confidentiality agreement. In fact, leading authority implies that the source's wish to remain confidential is an important factor to consider in determining whether to compel release of information. Indeed, the only case we have found which discusses breach of contract suggests that a source may bring an action against a publisher for breaking a promise of confidentiality. *See Huskey v. National Broadcasting Co.*, 632 F.Supp. 1282, 1292 n. 15 (N.D.Ill.1986).

The newspapers also argue that the governmental interest in allowing a civil damages suit is minimal because reporters' promises are ethical, not legal obligations, and court intervention in such cases is inappropriate. We disagree. The specter of a large damage award is a much more effective incentive for a publisher to honor a promise of confidentiality than the fear of criticism from other members of the press. Indeed, any such fear of professional criticism in this case was apparently insufficient to convince appellants to abide by their promises.

We are not convinced that the public's access to information is restricted by our decision to allow a contract damage award in this case. Were we not to enforce the newspapers' promises of confidentiality, confidential sources would have no legal recourse against unscrupulous reporters or editors. Ultimately, news sources could dry up, resulting in less newsworthy information to publish. Our decision enhances the legislatively expressed interest in protecting confidential news sources in order to promote the free flow of information to the media and, ultimately, to the public. *See* Minn.Stat. § 595.022 (1988).

Our decision also does not intrude into the editorial process itself, and does not limit the right to publish information lawfully obtained without a promise of confi-

dentiality. *Cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) (suggesting government cannot regulate editorial processes). In this case, the newspapers, through their reporters, voluntarily agreed not to publish Cohen's name in return for other publishable information. Damages were awarded not merely because the newspapers published Cohen's name but because by doing so, they violated their contracts with him. We do not think it an undue burden to require the press to keep its promises.

### C. *Waiver*

A constitutional right cannot be waived except in clear and compelling circumstances. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967). First amendment rights may be waived "where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver." *Erie Telecommunications, Inc. v. City of Erie, Pennsylvania*, 853 F.2d 1084, 1096 (3rd Cir. 1988). Under the circumstances in this case, we conclude that the newspapers effectively waived any first amendment rights they may have had to publish Cohen's name as the source of the documents relating to Johnson. The two people pledging confidentiality in the instant case were both seasoned reporters who had given such pledges on a regular basis for many years prior to this incident. They also knew Cohen's status as an active and prominent Independent Republican, and thus knew that his name could be of public interest. Therefore, they understood that they were waiving the right to publish a potentially newsworthy item in return for obtaining another potentially newsworthy item from Cohen.

The newspapers also argue that the waivers were not knowing and voluntary because the reporters did not know the information they were about to receive would be such as to make Cohen seem petty and unscrupulous for having released it. Some form of this argument, however, could be used in every confidential source situation because the reporter never knows exactly what information he or she will get when the promise is made. Furthermore, in this case, the reporters must have anticipated Cohen was to give them damaging information about a DFL candidate because he said that the information might relate to a political candidate. The reporters' waivers are not any less knowing or voluntary merely because they did not know exactly what information they would receive.

It is significant that the waiver in this case was not extracted by the state. Rather, the waiver was part of a negotiated agreement between experienced reporters and an experienced political operative. Under these circumstances, the newspapers' waivers do not deserve as much protection as would a criminal defendant pleading guilty to a crime or waiving trial by jury. It also is significant that the alleged state action here was not intended to suppress a viewpoint. It was merely a content-neutral enforcement of an agreement between private parties of equal bargaining power.

### II.

The Dispatch argues the trial court erred in failing to instruct the jury that there can be no contract where one party does not disclose all material facts which he knows the other party does not know and which the other party would need to know to make an informed decision under the circumstances. A party is entitled to a jury instruction only when the party presents evidence supporting its theory of recovery. *Lhotka v. Larson*, 307 Minn. 121, 125 n. 7, 238 N.W.2d 870, 874 n. 7 (1976). Here, Salisbury stated that Cohen did not deceive or mislead him in any way. He also stated he was well aware that Cohen was active in the IR party and was a Whitney supporter. Finally, Salisbury did not even consider whether the information was to be exclusive, and he did not ask Cohen about it. Given the lack of evidence of any fraudulent inducement, the

trial court properly refused to submit the proposed jury instructions.

■ The Tribune argues that the information provided by Cohen was so insignificant that it fails as consideration when compared with the much more valuable promise of confidentiality. As Cohen's expert journalist witness testified, however, such deals are common in the industry and there is no way journalists can know exactly how valuable information will be before the return promise of confidentiality is given. Furthermore, both Salisbury and Sturdevant felt that the information about Johnson was in fact important, thus undercutting any failure of consideration argument. The documents Cohen supplied were sufficient consideration.

■ The Tribune also claims the contract is unenforceable because the subject matter of the contract is the deceptive manipulation of the electoral process. The newspapers rely on 17 C.J.S. *Contracts* § 218 (1963), which states: "Contracts which impair or tend to impair the integrity of public elections are against public policy." This provision, however, contemplates contracts such as those where payment is contingent upon the use of influence to secure another's election or where the candidate is a party to the contract. Because Cohen made no payment to the newspapers and exacted no promise that the newspapers would use their influence or otherwise attempt to secure Whitney's election, the contract did not involve wrongful manipulation of the electoral process.

■ Finally, the newspapers argue that a promise of confidentiality is not enforceable because it is part of an "agreement that by its terms is not to be performed within one year from the making thereof." *See* Minn.Stat. § 513.01(1) (1988). The statute of frauds does not apply, however, where one party can and does fully perform within the year. *Langan v. Iverson,* 78 Minn. 299, 302, 80 N.W. 1051, 1052 (1899). The statute is thus inapplicable because Cohen fully performed his obligations upon delivery of the documents.

III.

The newspapers argue that the trial court erred in failing to grant judgment notwithstanding the verdict on the misrepresentation claim. The standard to be applied in determining the propriety of granting a motion for a judgment notwithstanding the verdict is whether there is any competent evidence reasonably tending to support the verdict. *Bisher v. Homart Development Co.,* 328 N.W.2d 731, 733 (Minn.1983) (quoting *Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975)). The trial court must accept the view of the evidence most favorable to the verdict and admit every inference reasonably to be drawn from that evidence. *Id.* When the facts are undisputed and reasonable minds can draw but one conclusion, the question becomes one of law for the court. *Kramer v. Kramer,* 282 Minn. 58, 65, 162 N.W.2d 708, 713 (1968). We find in the instant case that there was no misrepresentation as a matter of law, and the trial court erred in failing to grant the newspapers' motion for judgment notwithstanding the verdict on the misrepresentation claim.

■ To be actionable, a misrepresentation must misrepresent a present or past fact. *Dollar Travel Agency, Inc. v. Northwest Airlines, Inc.,* 354 N.W.2d 880, 883 (Minn.Ct.App.1984). Simply because a party in the future fails to perform does not mean that there was any misrepresentation at the time the contract was made. *Id.* However, if the party, when entering into the contract, never had any intent to perform the contract, then the act of entering into a contract with no intent to perform constitutes a misrepresentation. *Wood v. Schlagel,* 375 N.W.2d 561, 564 (Minn.Ct.App.1985).

■ Cohen concedes the reporters themselves intended to perform the contracts and that they did not commit misrepresentations. He claims, however, that the editors never intended to perform the contracts and that the intent not to perform should thus be deemed to have been present at the inception of the contracts,

when the reporters made the promises. Cohen relies on *Guy T. Bisbee Co. v. Granite City Investing Corp.*, 159 Minn. 238, 244, 199 N.W. 14, 16 (1924), for the proposition that an intent not to perform at the inception of a contract can be inferred where the period of time between the making of the promise and its repudiation is short, and there is no change in circumstances. Cohen's reliance on *Bisbee* is misplaced.

In *Bisbee*, there was other circumstantial evidence to suggest that the tortfeasor did not intend to keep the promise at the time the promise was made. Thus, the court was faced with an evidentiary problem in that, although the party may have indeed intended not to perform, there was no direct evidence of this intent. Recognizing that direct evidence of intent is often unavailable, the court held that under the circumstances outlined in that case, an intent not to perform could be inferred from the fact that the breach took place soon after the contracts were formed. *Id.* at 243–44, 199 N.W. at 16. In this case, however, because there is direct evidence of both the reporters' and editors' intentions, resort to inferences is unnecessary and inappropriate.

Cohen alternatively relies on *Swanson v. Domning*, 251 Minn. 110, 117, 86 N.W.2d 716, 721 (1957), which held that where a principal becomes aware that an agent has made untrue representations of fact, regardless of whether the agent himself knew the representations were untrue, the principal may not retain the benefits of that transaction and at the same time escape liability for the untrue representations by which the benefits were obtained. *Swanson* does not apply here, however, because the agents themselves made no misrepresentations, either innocently or knowingly.

■ Cohen also argues that his misrepresentation claim is based on the reporters' concealment of the fact that they had no authority to bind the newspapers. We find no evidence to support this theory. An omission of a material fact may give rise to a cause of action for misrepresenta-

tion if one party has special access to the facts and the other does not, or if omitting the fact is misleading. *Sit v. T & M Properties*, 408 N.W.2d 182, 186 (Minn.Ct.App. 1987). In this case, however, there was no evidence the reporters who promised confidentiality had special access to the newspapers' written policy regarding confidentiality. The evidence showed they were unaware of it. Further, there was no evidence that the omission of fact was misleading. The actual practice of the newspapers was to abide by their reporters' promises of confidentiality. In fact, no witness could recall a prior instance when the promise of a reporter was vetoed by an editor. Seasoned reporters believed they had authority to bind the newspapers. Based on past practice, we believe they did have such authority. Because it was the newspapers' practice to honor their reporters' promises of confidentiality, the reporters did not by omission misrepresent their authority.

■ Under these circumstances, the trial court erred in failing to grant the newspapers' motion for judgment notwithstanding the verdict on the misrepresentation claim. There was no evidence of material misrepresentations or omissions. Accordingly, we reverse on this issue. Because the newspapers engaged in no independent tort, punitive damages are unavailable, *see Haagenson v. National Farmers Union Property & Casualty Co.*, 277 N.W.2d 648, 652 (Minn.1979), and the trial court's award of punitive damages must be set aside.

### IV.

■ Because there were no misrepresentations, Cohen may recover only compensatory damages resulting from the breaches of contracts. The nonpunitive damages were awarded to compensate Cohen for loss of his job. The newspapers claim these are consequential or special damages, i.e., damages not contemplated by the parties when entering into the contracts, and therefore are not recoverable in a breach of contract action.

Minnesota follows the rule of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145

(1854), which holds that damages recoverable in contract actions are those which arise naturally from the breach or those which can be supposed to have been contemplated by the parties when the contract was formed. *Lesmeister v. Dilly,* 330 N.W.2d 95, 103 (Minn.1983). Whether damages naturally arose from the breach (reasonably foreseeable as a probable consequence) or were contemplated by the parties is a question of fact which depends upon the nature of the contract and the circumstances surrounding its execution. *Franklin Manufacturing Co. v. Union Pacific Railroad Co.,* 311 Minn. 296, 298–99, 248 N.W.2d 324, 326 (1976).

When asked why he wanted anonymity, Cohen testified:

> I feared retribution, I feared retaliation that could be damaging to me personally, that could damage my wife and daughters, that could damage the campaign, by a powerful media, by powerful politicians, for revealing the truth.

He also stated:

> I think that were my identity revealed because I was the messenger of ill tidings that the public, my employer, the press, the world at large, would heap opprobrium on my head.

Even if Cohen himself did not fear specifically for the loss of his job, a Dispatch editor and an expert journalist witness both testified that confidential sources often seek confidentiality exactly because they are afraid they might lose their jobs. The expert witness testified that editors are or should be well aware of the reasonable consequences, including loss of employment, which could occur if the confidences are revealed. The evidence was sufficient to support the finding that the loss of Cohen's employment was reasonably foreseeable. Cohen's job loss therefore is in the nature of general, as opposed to consequential, damages and is recoverable in contract.

## V.

The Tribune argues that the trial court erred in admitting a number of Tribune newspaper articles. The trial court has discretion in its determinations as to the relevance and prejudicial effect of evidence. *State v. Lee,* 282 N.W.2d 896, 901 (Minn.1979). The admission of inadmissible evidence requires a new trial only if the error is prejudicial. *See Fewell v. Tappan,* 223 Minn. 483, 497, 27 N.W.2d 648, 656 (1947).

The challenged newspaper articles fall roughly into three categories. First, a number of the articles were written with the use of confidential sources, whose identities were newsworthy according to Tribune witnesses. Despite the newsworthiness of these sources' identities, the Tribune never revealed their identities. Second, some articles used confidential sources despite the fact that the Tribune did not have an "exclusive" on the information from the sources. This evidence was offered to rebut the claim that Cohen's identity was revealed because he failed to give the Tribune an "exclusive." Finally, Cohen offered the garbage can editorial cartoon and two column articles to show that the Tribune was acting with willful indifference to his rights, and was continuing to disparage him while failing to disclose its own breach of promise. This evidence of the Tribune's failure to act even-handedly was offered to rebut claims that the Tribune had to publish Cohen's identity to give its readers a fair picture.

We conclude that the trial court was well within its discretion in determining that the offered newspaper articles were relevant and more probative than prejudicial. *See* Minn.R.Evid. 403. The Tribune has failed to show that the trial court clearly abused its discretion in admitting the articles.

The Tribune also argues that the closing argument for Cohen was so inflammatory that a new trial is required. We disagree. A major focus of the newspapers' trial strategy was to portray Cohen as a scurrilous and dishonest politicker. In light of these attacks on Cohen's character, comments on the newspapers' ignoble motivations are not unduly prejudicial. The trial court gave a lengthy curative instruction designed to neutralize the strong arguments made by counsel on all sides. Fur-

ther, the closing argument at issue was based on admissible evidence or reasonable inferences drawn from the evidence. Under these circumstances, the trial court's refusal to order a new trial based on inflammatory arguments was not an abuse of discretion. *See Connolly v. Nicollet Hotel*, 258 Minn. 405, 420, 104 N.W.2d 721, 732 (1960).

## DECISION

The trial court's judgment determining that the newspapers are jointly and severally liable for $200,000 in compensatory damages as a result of their breaches of contract is affirmed. The trial court erred, however, in failing to set aside the misrepresentation claim because there was no evidence that the newspapers made material misrepresentations or omissions. Because the newspapers engaged in no independent tort, the trial court's judgment awarding punitive damages to Cohen is reversed.

Affirmed in part and reversed in part.

CRIPPEN, Judge, concurring in part, dissenting in part.

I agree appellants are entitled to relief from a judgment premised on a tort allegation. Because we are compelled to respect vital standards on freedom of the press, the judgment on respondent's contract claim is fundamentally flawed and also should be reversed. *See* U.S. Const. amend. I (enunciating the freedom of speech, and expressly prohibiting laws abridging the freedom of the press); Minn. Const. art. I, § 3 (likewise adding to the guarantee for free speech a declaration that "the liberty of the press shall forever remain inviolate").

Support for the contract claim is premised on two categories of argument, and both misshape the law of the case.

First, it is said that conflict with the first amendment here is unsubstantial or even nonexistent. To the contrary, what has happened here involves the exercise of the coercive power of the state to punish the choice of the private press to publish. Making the problem still more critical, this sanction occurs for printing a true story on the purely political behavior of a public figure, and on the effort of respondent to cover the occurrence of that conduct.

Second, addressing the sacrifice of press freedom, it is asserted that this is justified by predominant considerations. This claim is premised on the notion that verbal assurances of a press reporter are uniquely important, either for the sake of respondent or as a measure of improvidence of the press justifying the loss of its freedoms. Here again, the arguments are untenable; they conflict with important decisions delimiting the state interest in common law claims, and stringent restrictions on the notion of any waiver of freedom of the press.

The consequence of these mistaken propositions of law is a decision for sanctions which is out of sync with settled first amendment principles. No authority, direct or by remote analogy, permits an award of damages for publishing political material, and justifies this as an application of state common law not even slightly limited in deference to the first amendment. Nor does any authority, direct or by analogy, permit sanctions for publishing political information and justify this on the premise that the press waived the right to publish, much less on the premise such a waiver occurs upon assurances not to publish solicited informally from media reporters.

More particularly, there are six fundamental misconceptions in the rationale for the contract claim. Four are in the effort to deny that this encroachment on the first amendment is significant. The fifth is the unwarranted enlargement of a state interest in the common law of contracts. The sixth is the wrongful disregard for limits on the notion of a press freedom waiver. In each instance, propositions favoring the damage award are made without precedential authority or by reference to cases that do not adequately support the contention.

1. First amendment implicated.

Initially, it is argued that there has been no restriction of press freedom in this case,

nothing more than "neutral enforcement" of contract law. The trial court concluded that respondent's contract claim was one with "no constitutional dimension." This proposition depends on disregard for essential facts of the case, and it relies on authorities having no bearing on the kinds of restrictions occurring here.

We are not dealing with a regular contract claim. Rather, respondent asks the courts to enforce an agreement not to publish—a pledge not to exercise press freedom. In different words, respondent seeks a judicial decree that the choice to publish information is unlawful and subject to the sanction of a money judgment. Neither the promise nor the claim are neutral to the first amendment. Rather, both inescapably implicate freedom of the press.

Authorities are cited for the proposition that civil and criminal remedies may be applied by the courts even if they place "certain conditions" upon the publication of newsworthy information. This statement of law is premised on a concept having to do with remedies which only incidentally affect press freedom, and no authorities on the subject stand for a proposition nearly so bold as to permit the direct imposition of penalties for publishing a political news story. *See Branzburg v. Hayes,* 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972) (enforceability of civil and criminal statutes only "incidentally burdening" the press); *Price v. International Union,* 621 F.Supp. 1243, 1246–50 (D.C.Conn.1985) (commercial labor-management contract; trial court dicta on enforceability of union dues provision, thus enabling union political activity; decision without judicial action on the content of employee speech).

In sum, the suggestion here that the damage award is neutral to press freedom is unsound.

## 2. Intrusion upon editorial process.

To otherwise distance this case from the first amendment, it is argued that the trial court's judgment does not intrude into the editorial process, but only upon the rights and privileges surrounding promises of anonymity. This observation is essentially inaccurate, and it is not supported by any authority.

The issue on the contract claim focused singularly on the exercise of editorial judgment. Moreover, as suggested by appellant Cowles, the grievance respondent developed before the trial court was not on the choice to disclose his name but on the other contents of the reports—the breach of contract claim was thin cover for a much more intrusive indictment on editorial choices.

When the state determines through civil lawsuits what constitutes a contract, when a breach occurs, and which special circumstances permit disregard of the promise, it usurps editorial decisionmaking and chills exercise of press freedom. In addition, this regulation inevitably shapes the decision about when the promise is appropriately used. It is for editors, not the courts, to decide when promises on content should be made and to decide when publication is important. So, for example, in the context of this case, it is for editors, not for judges, to determine whether identification of respondent was necessary for an accurate report on the political event.

## 3. However pictured, intrusion is intrusion.

Respondent argues that regulating press freedom in the circumstances of this case does not frustrate purposes of the first amendment but enhances them—that appellants really should accept the trial court judgment, because a little correction is for their own good. Respondent portrays a public policy for anonymity of sources, so that the press has an enlarged capacity to get disclosures of information. Thus, as respondent observes, the press has historically defended its right against disclosure of sources. *See, e.g., Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978); *see also* Minn.Stat. § 595.021–595.025 (1988) (statutory limits on compulsory disclosure). Respondent also produced expert opinions that the violated promise of anonymity constitutes a breach of journalistic ethics.

Undoubtedly, the good judgment of the press is a matter of serious public importance. Moreover, it is certainly plausible to believe that press agencies will generally deplore compulsory disclosure of sources. Nevertheless, it must be recognized that the honor and the effectiveness of press agencies is a matter of their own prerogative, subject to the public exchange of ideas, all protected by the first amendment. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) (not yet demonstrated how government can regulate the exercise of editorial control and judgment "consistent with First Amendment guarantees of a free press as they have evolved to this time."). The agencies of government, including the judiciary, have neither the right nor the duty to measure or establish the wisdom and honor of the press.

### 4. Freedom from sanctions for publication.

Finally, to further the attempt to imagine a gulf between this case and the Constitution, the plea is made that at least this case does not involve prior restraint. While this distinction may be made, there is no authority whatsoever suggesting cause to minimize, even by comparison with prior restraint law, the extraordinary first amendment danger in permitting damage awards as a sanction for publication on public issues.

To the contrary, according to authoritative declarations of law, it is important that the courts vigorously scrutinize money judgments and other sanctions against the choice to publish. *See Sullivan,* 376 U.S. at 277, 84 S.Ct. at 724 (inhibiting effect of damage awards); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986) ("chilling" effect of press burden to prove truth when sued for damages). In addition, as discussed below on the issue of waiver, a federal appellate court in a suit for damages has attested that it is "manifest," even where an individual has agreed not to publish, that the first amendment would not permit restrictions on publication of unclassified information on the political topic of government activity. *United States v. Snepp,* 595 F.2d 926, 930 n. 2, 932 (4th Cir.1979).

### 5. Contract law versus the first amendment.

Ultimately, the majority describes the manner in which the first amendment is implicated by the trial court judgment. The court concludes it has found an "effective incentive" for publishers. It is contended that the trial court's intrusion upon the first amendment is justified.

The argument here to justify limiting press freedom rests on the premise that Minnesota's contract law is a compelling interest such as to shape and restrict constitutional law. Thus, in harmony with the historic misapplication of various state law claims, the common law of contracts is given "talismanic immunity" from constitutional limitations. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). There is no authority for this position, either in terms of the first amendment or otherwise.

It is said, mistakenly, that the Minnesota Supreme Court has classified the state interest in contract law as compelling. *Duluth Lumber & Plywood v. Delta Development, Inc.,* 281 N.W.2d 377, 380–83 (Minn. 1979) is cited as support for such a proposition. The most that can be said of *Delta Development* is that there are some circumstances where the state's interest in commercial contracts may supersede some competing interests. *Id.* at 380–83 (state interest in an Indian agency's agreement to buy materials from off the reservation compels disregard for competing principles on Indian rights of self-government). *Delta Development* did not deal with a constitutional right, much less with freedom of the press or any other right under the first amendment. Moreover, the case requires an examination of the circumstances of each case, which must be done here.

How is the state's interest to be evaluated correctly? As already noted, governmental action in the form of an award of damages stifles first amendment freedoms.

It has a more "inhibiting" effect than regulation with criminal sanctions. *Sullivan*, 376 U.S. at 277, 84 S.Ct. at 724. This public restriction of press freedom is unlawful absent demonstration of a state interest "of the highest order." *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 105, 99 S.Ct. 2667, 2672, 61 L.Ed.2d 399 (1979).

Before examining the competing state interest, it is necessary to recognize the weight on the other side of the scale. Only an extraordinary state interest permits limitation of the first amendment, because the first amendment has such preeminence in our law. "The suppression or abridgment of the publicity afforded by a free press cannot be regarded otherwise than with grave concern." *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). The freedom of the press is nothing less than "supremely precious" in our society. *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). The Constitution highlights press freedom from among forms of free speech; singularly, our state constitution promises that press freedom will "forever remain inviolate," untouched. Minn. Const. art. I, § 3.

In addition, it is a settled matter of law that the situation here is at the very pinnacle of concern for press freedom. The topic of respondent's conduct is a public and political matter which the Supreme Court finds "at the heart of the first amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978) (citing *Thornhill v. Alabama*, 310 U.S. 88, 101, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940)). Speech on public issues rests "on the highest rung of the hierachy of first amendment values." *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980). To be even more particular, "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for public office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971).

How significant is the competing state interest? There are some identifiable state concerns that supersede the freedom of the press. Thus, for example, in *Sullivan* and its progeny, the United States Supreme Court carefully enunciated the nature and extent of an overriding state interest to protect individuals from publication of false information. Only recently the Court issued another among several decisions on state interests in protecting privacy. *The Florida Star v. B.J.F.*, — U.S. —, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). In *Florida Star*, the court noted various other significant state interests, including its interest in fair criminal trials. *Id.,* — U.S. at — – — n. 5, — n. 6, 109 S.Ct. at 2607 n. 5, 2608 n. 6.

In this case, respondent did not act as a private figure but as a political operative in public places, dealing with a purely political topic. The disputed publications of appellants were certainly on "matters of public concern." *Thornhill*, 310 U.S. at 101, 60 S.Ct. at 744. No privacy interest is involved; in contrast, the topic requires the most urgent respect for first amendment freedom that is appropriate for political campaign activity. *Monitor Patriot Co.,* 401 U.S. at 272, 91 S.Ct. at 625.

Further, respondent's claim is not premised on the notion of a published falsehood. We are dealing with true information, and it is the truth that has hurt respondent. *See Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964) ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned.").

What then is the state interest reflected in this trial court judgment? Respondent was given assurances of anonymity and he acted on them. He may have trusted that nothing more would be said about his conduct. The bargain was broken and respondent suffered damages. Still, respondent identifies the interest as one to uphold an "ordinary commercial arrangement." The interest is reflected in the common law of contracts. Incidentally, a great portion of this common law is given over to the notion

of equitable principles that preclude mechanical application of contract doctrine.

The state's interest to enforce performance of contracts, in the circumstances of this case, is mostly common. *Cf., e.g., Delta Development*, 281 N.W.2d at 380–83 (interest predominates over certain statutory or treaty interests, and then only in limited circumstances). Even if viewed expansively, it does not rise to the prescribed highest order which permits disregard of the first amendment.

The events here are colored singularly by a political scheme to broadcast a political attack but at the same time to evade responsibility for the act. Respondent was the chosen operative for that purpose. He went into the forums of public discussion to volunteer information, and to elicit promises that his unseemly activity would be covered up. He assembled the ingredients for an editorial predicament: to publish respondent's information as an anonymous report would be petty; to bury the information he delivered would be partial; and to imprecisely attribute disclosure of the information to a candidate's campaign would be illegitimate. To accomplish his ends respondent chose not to approach the editors who would be expected to make publication decisions. He chose not to make his proposal in a deliberative setting. Instead, he approached reporters on their beat, expecting he might readily arouse in them some desire for nuggets of political news.

Whether or not this course of conduct produced an agreement according to the niceties of contract and agency law, the enforcement of the purported agreement is not a matter of state interest of the highest order. Moreover, because respondent's concealment attempt did not regard false information or private conduct, his complaint involves a state interest in civil sanctions which is unadorned by any additional cause for coercive steps against the press. We need not decide whether some agreements on the content of publication might be enforceable. In the circumstances here, the Constitution should prevail.

Some might prefer wording this rationale on contract claims in terms of the law of contracts on agreements void as against public policy. The public policy in this instance is first amendment law, and this alternative approach to the issue requires the same comparison of competing interests. Whichever approach is taken, the result is the same. The contract claim should not have been tried and a judgment on the claim should not be affirmed.

6. First amendment not waived.

Respondent contends that the newspapers waived constitutional freedoms by agreeing not to expose his conduct. Here, respondent puts his argument in the form addressed in *Sullivan:* whether the press has done anything to forfeit its freedom under the Constitution. *Sullivan*, 376 U.S. at 271, 84 S.Ct. at 723.

The waiver argument provides a new framework to examine this first amendment issue, but is twice mistaken. First, the waiver contention is premised on a contract claim already defective for want of an adequate state interest for its protection.

Second, respondent's waiver argument exposes further obstacles to his contract case. There are stringent conditions for waiver of first amendment press freedoms. The broad view of waiver urged by respondent and adopted by this court requires disregard for the law of the case on these conditions.

Singularly, the waiver contention here rests on the proposition that the first amendment may be waived when it is clear one has done so knowingly and voluntarily, a matter of law attributed to *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1096 (3rd Cir.1988). This description of the law is incomplete, even as to the language of *Erie*. *Id.* at 1094 (no such waiver absent "clear and compelling circumstances.").

The courts scrutinize the claim of waiver with vigor more clearly evident than already observed in assessment of state interests. "[C]ourts indulge every reasonable presumption against waiver" of any fundamental constitutional right. *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389,

393, 57 S.Ct. 809, 811, 81 L.Ed. 1177 (1937) (citing *Hodges v. Easton,* 106 U.S. 408, 412, 27 L.Ed. 169 (1882)). If waiver of first amendment press rights can occur at all, it will arise only in "clear and compelling" circumstances. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967). If a waiver is identified, it "must be narrowly construed to effectuate the policies of the First Amendment." *National Polymer Products, Inc. v. Borg–Warner Corp.,* 641 F.2d 418, 424 (6th Cir.1981).

The circumstances here do not constitute, clearly and compellingly, a case where first amendment freedom has been renounced. Respondent solicited promises of reporters to serve his personal interests, to hide political conduct that others would believe to be shabby. He neither sought nor obtained a deliberative pledge of anonymity by media editors. Finally, what respondent wanted was not discussed, viz., an editorial decision to repudiate the fundamental responsibility to fairly and truthfully inform the public on political campaign conduct. The issue is not whether a waiver occurred under these circumstances for civil law purposes. We are not at liberty to disregard the constitutional conditions on waiver.

Given publication of true facts on an important event of a political campaign, the clear and compelling case here is for upholding press freedom. On both a regular contract approach and a waiver analysis, respondent's breach of contract claim was constitutionally defective and should not have been tried.

Further analysis reveals the waiver concept is even more restricted, and respondent's contract claim more surely defeated. To explain this proposition, it must first be observed that there is no precedent for a finding of waiver by agreement on the part of the press, and no more than mixed indications regarding waiver by agreement for any political speech. Respondent cites as authority on the issue the *per curiam* decision of the United States Supreme Court in *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). In *Snepp,* the court found enforceable a former CIA agent's agreement to submit material for pre-publication review. However, the holding was not based on waiver of rights or the effects of a regular agreement, but on the intelligence agent's trust relationship in having access to classified information, such that his agreement for pre-publication clearance was a trust agreement.

More importantly, *Snepp,* which reviewed a trial court damage award, stands for a very different conclusion of law. In this and other decisions on the rights of former CIA agents, dealing both with prior restraint and damage claims, it has been recognized that because of the first amendment the agreements of agents against disclosure are "manifestly" unenforceable to the extent those agreements address non-classified information. *See United States v. Snepp,* 595 F.2d at 930 n. 2, 932 (notwithstanding Snepp's agreement to never divulge "any information concerning intelligence or CIA that has not been made public by CIA," "manifestly the first amendment would not permit the CIA to withhold consent to publication except with respect to classified information not in the public domain"); *Snepp,* 444 U.S. at 510, 511, 100 S.Ct. at 765, 766 (twice noting without correction the Fourth Circuit opinion that Snepp had a first amendment right to publish unclassified information). *United States v. Marchetti,* 466 F.2d 1309, 1313, 1317 (4th Cir.1972) (as to unclassified information, the first amendment precludes disclosure restrictions established "contractually or otherwise;" by signing a secrecy agreement, Marchetti "did not surrender his First Amendment right of free speech.").

Why might waiver be so inapplicable in the context of the first amendment, at least as to true information on political affairs? I suggest that disfavor for such a waiver harmonizes with the interest of the people generally, discussed in the conclusion of this opinion, for the unfettered flow of public information. As observed there, freedom of the press is everyone's right, not belonging alone to the editor and publisher. How can the law attribute to the press the capacity to waive a right which is not its own?

Clearly, there is a general interest of a unique kind regarding press freedom on political facts. We need not decide whether this policy precludes waiver of the freedom in all such cases. At least in the circumstances here it should be held that there was no waiver and that there was no enforceable contract.

### 7. Acquisition of information.

Finally, respondent states an additional argument needing only brief attention. Addressing both his tort and his contract claims, respondent suggests that appellants' conduct constitutes wrongful acquisition of information. Although this argument may have bearing on a claim of tortious misconduct, I do not perceive its relevance to the contract issue. There was no wrongful act of appellants in connection with the conduct of their reporters or in the acquisition of information peddled by respondent. Respondent's grievance is with the editorial choice to publish, which invites attention to the earlier acquisition events only insofar as they bear on the flawed claims of a contract or a waiver of first amendment rights.

### 8. Conclusion.

The award of damages here directly and substantially implicates the first amendment, and the vitality of the freedom of the press predominates in the face of competing considerations on contract law and waiver of rights. A judgment for damages in this case erroneously restricts a fundamental freedom we are to hold inviolate.

Each misconception discussed here poses the same danger, a construction of constitutional law which licenses judicial action, employing the common law, to decide whether press reports are just and to exact a penalty for a publication found to be objectionable. This is fundamentally offensive to the first amendment. "Truth and understanding," said Milton to Parliament in 1644, "are not such wares as to be monopolized and traded in by tickets and statutes and standards." J. Milton, *Areopagitia*, The Portable Milton 181 (1977).

Correctly applied, the first amendment guarantees that the press has special immunity from officials willing to restrict its freedom. Neither the courts nor other agencies of government can deal with the conduct of publishing in the same way they handle other conduct with similar characteristics. Why must this be so? First, although the press often cannot claim protection afforded to the weak, it is as likely target of regulation as the weakest citizen because it is the critic of the regulator, the adversary for many designs of public figures. Properly upheld, the first amendment defeats this risk. In addition, the first amendment is not singularly for protecting press agencies, but generally "to prohibit government from limiting the stock of information from which members of the public may draw." *Bellotti*, 435 U.S. at 783, 98 S.Ct. at 1419. It is the high interest of the people against government regulation, not alone the interest of the speaker or publisher that is threatened by judicial proceedings on common law claims. Speech on public affairs is "more than self-expression, it is the essence of self-government." *Garrison*, 379 U.S. at 75, 85 S.Ct. at 216. Even more to the point, demonstrating an interest everyone shares with the private press:

> A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.

*Grosjean*, 297 U.S. at 250, 56 S.Ct. at 449. In sum, the publication conduct of the press cannot be governed by the courts in the same manner as other conduct is judged. The award of damages here defies these principles and conflicts with the very essence of a special freedom of the press under the Constitution.

I join the majority on respondent's tort claim, but I respectfully dissent on the choice to affirm the portion of the judgment premised on a contract claim.