Charles J. CULLEN, George L. Parent, Carlton G. Shaw, and Edwin F. Spencer, Plaintiffs,

v.

GROVE PRESS, INC., Titicut Follies Distribution Co., Inc. and F. and A. Theatres, Inc., Defendants.

No. 67 Civ. 4246.

United States District Court
S. D. New York.

Nov. 30, 1967.

Robert F. Muse, Boston, Mass., for plaintiffs.

Rembar & Zolotar, New York City, for defendants Grove Press, Inc. and Titicut Follies Distribution Co., Inc.

MANSFIELD, District Judge.

In this diversity action for defamation and invasion of privacy, plaintiffs, four Correction Officers at Massachusetts Correctional Institution, South Bridgewater, Mass. (hereinafter "Bridgewater"), seek a preliminary injunction to prevent the distribution and exhibition by defendants of a motion picture entitled "Titicut Follies" on the ground that the film violates plaintiffs' right of privacy under New York Civil Rights Law, McKinney's Consol.Laws, c. 6, § 51. The facts, as they appear from the moving and opposing papers and affidavits, are as follows:

For a period of about eight weeks in the spring and summer of 1966, Frederick Wiseman and at least two technical assistants were permitted[1] to enter Bridgewater daily, under the supervision and control of a senior Correction Officer, for the purpose of photographing and producing a real-life film documenting the care and treatment of inmates, particularly those incarcerated at the State Hospital Division for the criminally insane, where plaintiffs were employed by the Commonwealth of Massachusetts as Correction Officers. The film was made with portable sound and camera equipment usually located within a few feet of the inmates and guards as they went about their daily routine. The filmmaking equipment was not hidden and no scenes were staged. Plaintiffs were instructed by their superiors to carry out their duties as usual, and from time to time were subject to the directions of Wiseman for the purpose of making the film. Photographs of plaintiffs appear during the course of the film, particularly in a scene in which they are shown conducting a "skin search" of naked inmates.

Since the more than 80,000 feet of film shot at Bridgewater during the eight-week period far exceeded the normal playing period for a documentary film, Wiseman and his staff cut and edited it to a final product, about 3,200 feet long and requiring 84 minutes running time, which was entitled "Titicut Follies."[2] The film was then allegedly assigned to defendant Grove Press, Inc., and distributed and exhibited through its subsidiary, defendant Titicut Follies Film Distributing Co., Inc. For a time it was exhibited at a commercial theatre owned by defendant F. & A. Theatres, Inc., which has not been served with the Order to Show Cause bringing on this motion for preliminary injunction.

Defendants argue that even if plaintiffs are able to make out a case under the New York right of privacy statute, the exhibition and distribution of the film is protected by the First Amendment of the United States Constitution, as recently interpreted by the Supreme Court in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), where the Court said:

"We hold that the constitutional protections for speech and press preclude the application of the New York [right of privacy] statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." (385 U.S. at 387–388, 87 S.Ct. at 542)

The conditions in public institutions such as Bridgewater for the care of the criminally insane, including the physical facilities, conduct of employees, and type of treatment administered to inmates, are

1. Indeed, Wiseman and his staff could hardly have spent approximately eight weeks on the premises shooting film without such permission and cooperation.

2. The title "Titicut Follies" represents the name of an annual variety show put on jointly by the inmates and employees of Bridgewater, the term "Titicut" being the Indian name for the area immediately surrounding Bridgewater. The title is not derived from the words "titillate" or "titillation".

matters which are of great interest to the public generally. Such public interest is both legitimate and healthy. Quite aside from the fact that substantial sums of taxpayers' money are spent annually on such institutions, there is the necessity for keeping the public informed as a means of developing responsible suggestions for improvement and of avoiding abuse of inmates who for the most part are unable intelligently to voice any effective suggestions or protests. Distasteful as the subject matter may often be, it represents an ever-increasing phenomenon in our society that cannot be swept under the rug. Defendants have submitted an imposing array of affidavits from experts in psychiatry, law, sociology, and other fields concerned with the care of the mentally ill, attesting to the importance of the film in contributing to public and professional understanding of current conditions in mental institutions, and have also submitted reviews by critics acclaiming the film's artistic merit.

■ In view of the legitimate public interest in such matters and because "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments", Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 502, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952), and see Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), plaintiffs' motion must be denied unless "Titicut Follies" is a false report of conditions at Bridgewater, made with knowledge of its falsity or in reckless disregard of the truth, Time, Inc. v. Hill, supra, see American Law Institute Restatement of the Law of Torts, 2nd, Tentative Draft No. 13, Apr. 27, 1967, § 652 F. pp. 127–38.

■ Plaintiffs' complaint and moving papers fail to anticipate or meet the teachings of Time, Inc. v. Hill, supra, being content merely to allege invasion of privacy and defamation. The complaint alleges that Wiseman and his associates assured plaintiffs that the filming of "skin searches" of inmates would reveal only the inmates' upper extremities and that the film would be used and displayed only for the purpose of education in connection with the care of the criminally insane; and that the film was thereafter promoted for exhibition in New York City through inflammatory advertising depicting scenes in which plaintiffs are photographically visible to the viewer and in which some inmates are characterized as "naked inmates", "inmates taunted into hysteria by their guards until they explode in frenzied wrath" and as "indistinguishable from the guards". On the pertinent issues the moving papers offer no additional facts other than the general statement that the film "has been edited by the said Wiseman and his associates and distributed by the defendants in such a manner as to emphasize certain erotic aspects of nudity and overtones and suggestions of indifference and brutality on the part of the Correction Officers as a class of which your plaintiffs are members."

Faced with the Supreme Court's decision in Time, Inc. v. Hill, plaintiffs on oral argument and in a reply memorandum contend in effect that the display of inmates' nudity in the film was unnecessary to any public interest involved, and that the film does not give a true and balanced impression of conditions at Bridgewater but distorts conditions thereby emphasizing the bizarre and failing to show other aspects that would explain the scenes that are portrayed and thus put them in proper context.

The fact that the film, though documentary in nature, has been exhibited to the general public for an admission price at a commercial theatre, and that much of the original 80,000 feet was not used in the final documentary, is of little weight on the issue before this Court, which is whether the documentary, as edited, gives a deliberately or recklessly false account of conditions at Bridgewater.

The producer and director of the film, a law school graduate and former teacher of criminal law, psychiatry and legal medicine, has engaged in various re-

search projects involving social science material and the law, including a study (pursuant to a grant from the National Institute of Health) of the relationship between crime and mental illness, and a report for the National Crime Commission dealing with social problems. He asserts under oath that the purpose of "Titicut Follies" was to give the general public a true and objective picture of typical conditions existing in many state institutions for the criminally insane, as reflected at Bridgewater, one of the oldest of such institutions; and that the film fairly and accurately depicts such conditions without any attempt to editorialize, to place undue emphasis on nudity or sex, or to distort the activities of medical personnel, social workers or correctional employees.

The Court viewed the film with the consent of all parties. While it is undoubtedly true that a motion picture camera, used under skillful direction, is capable of substantial distortion, and that this Court could never be absolutely certain whether the film accurately portrays the conditions at Bridgewater (at least without personal observation that might require weeks), I am satisfied that the picture does not knowingly or recklessly falsify or misrepresent such conditions or the conduct of the plaintiffs. By its very nature the subject matter is such that a chronicle of it must to some extent be gruesome and depressing in character, and in this case the picture fulfills such anticipation. The loudly vocal antics, haunting stares and grim behavior of many inmates, are photographed against the starkly depressing background of a bare, prison-type hospital. The film shows detailed closeups of such episodes as the forced nose-feeding of an inmate on a hunger strike and his later death and burial; the explosive reaction of an inmate to repeated taunting by Correction Officers about his failure to keep his cell clean; the degrading process of subjecting inmates to stripping off their clothes publicly for a "skin search" conducted by Correction Officers for the purpose of discovering contraband; the questioning by a staff psychiatrist of a young paranoid husband and father committed for sex attacks on children; and the unhappy protests of a young, articulate schizophrenic to the effect that after one and a half years as an inmate he is being driven insane by the surroundings and by the poor treatment or lack of treatment by the staff.

The foregoing scenes may well create an impression of hopelessness and inadequacy, an insensitivity on the part of both Correction Officers and staff doctors toward inmates under their care, a failure to accord to the inmates the minimum dignity due to human beings, and an atmosphere of stygian purgatory where they are relegated to the slow process of waiting for death. Plaintiffs, however, have offered no proof that the filmed events and activities are false or distorted. On the contrary the producer contends that these scenes are typical and in support of his contention has offered to exhibit to the Court the balance of the 80,000 feet of film. In view of the absence of any evidence to the contrary, the Court does not find any falsity or substantial distortion, knowing or reckless, in "Titicut Follies" as edited. Assuming the substantial accuracy of the film, it deals with a subject of legitimate public interest and indicates a lack of sufficient competent personnel and funds to meet some of the problems portrayed.

■■ There remains the question of whether plaintiffs are entitled to relief on the ground that the film is obscene, thereby precluding the defendants from invoking the First Amendment, a contention of doubtful merit that is at best hinted at in plaintiffs' reply. While it is true that in a few scenes, which represent a relatively small portion of the film, inmates are disclosed in a completely nude state, with their private parts exposed, the nudity appears in each instance to form an integral part of an episode that is of legitimate public interest, such as the process of conducting public "skin searches" of the inmates, or the living conditions in

the inmates' cells where they are kept without clothes, or the like. There are no commentaries or actions that could be construed as an appeal to any prurient interest in sex, and this Court does not believe that the material is so patently offensive as to affront community standards. See A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Atty. Gen. of Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). In short, the dominant theme is hardly one appealing to a prurient interest in sex. Furthermore the film, viewed as a whole, is of educational, not entertainment, interest. It therefore becomes unnecessary to consider whether the plaintiffs, public employees who are not depicted in the nude and who consented to their being filmed in such scenes with knowledge that they would be exhibited to others, have any standing to seek relief based upon the nudity of the inmates.

■ Plaintiffs' further contention that their participation in the filmed scenes with naked inmates was subject to an understanding that only the "upper extremities" of the inmates would be photographed and that the film would be exhibited only for "educational purposes", such as on educational television, and not at commercial theatres, is sharply disputed by defendants and, even if true, would not provide a basis for relief, provided the film is within the protection of the First Amendment. No proof was offered by the plaintiffs in support of their allegation of "inflammatory advertising".

On the basis of the moving and opposing papers and affidavits, and after viewing the film itself, the Court concludes that the film is not a false report made with knowledge of its falsity or in reckless disregard of the truth, that it is not obscene and that it is therefore protected by the First Amendment. This conclusion does not, of course, constitute an adjudication of rights of non-parties, such as individual inmates claiming violation of their own personal rights or state officials suing for breach of contract, if any, with respect to conditions for exhibition of the film.

The motion for preliminary injunction is denied. The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 65, F.R.Civ.P.

So ordered.