Jill RUZICKA, Plaintiff,

v.

The CONDE NAST PUBLICATIONS, INC. and Claudia Dreifus, Defendants.

No. Civ. 4–88–904.

United States District Court, D. Minnesota, Fourth Division.

March 27, 1990.

Elliot Rothenberg, Minneapolis, Minn., for plaintiff.

Thomas Tinkham and Leslie J. Anderson, Dorsey & Whitney, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This case is before the Court on defendants' motion for summary judgment. The motion will be granted.

FACTS

This lawsuit concerns an article about sexual abuse by therapists published in the September 1988 issue of *Glamour* magazine. Plaintiff Jill Ruzicka was interviewed for the article. Her experience of

sexual abuse was discussed in the article. Ruzicka is a Minnesota resident. Complaint ¶ 1. Defendant The Conde Nast Publications, Inc. is the publisher of *Glamour*. Conde Nast is incorporated and has its principal place of business in New York. Defendants' Answer ¶ 1. Defendant Claudia Dreifus is the author of the article and a resident of New York. *Id.*

In 1981, plaintiff and her daughter sued their psychiatrist, Dr. Jerome Bach, charging him with improper sexual conduct during therapy sessions from May 1979 to January 1980. Plaintiff also sued the Minnesota Board of Medical Examiners (Board) for its alleged failure to properly supervise Bach while he was on probation for having had sexual contact with his patients. In 1982, plaintiff received an out-of-court settlement on her claims and the Board suspended the psychiatrist's license.

Plaintiff's malpractice suit against Bach and the Board's action on the psychiatrist's license were covered in the press. In August 1981, an article in the Minneapolis Tribune described the suit. The article contained the names and ages of plaintiff and her daughter, stated where plaintiff worked, and quoted plaintiff's allegations that she was "repeatedly fondled, kissed and embraced" by the psychiatrist. Appendix to Defendant's Memorandum, Exh. 1 (hereinafter App. 1). A smaller article which reported her name was also carried in the Minneapolis Star. App. 3. In July 1982, the Minneapolis Tribune and the St. Paul Pioneer Press carried reports on the psychiatrist's suspension. The July 1982 article in the Minneapolis Tribune named the plaintiff and described her allegations against the psychiatrist. App. 3. The article in the St. Paul Pioneer Press briefly described plaintiff's suit but did not give her name. App. 4.

Plaintiff was later appointed to the Minnesota Task Force on Sexual Exploitation by Counselors and Therapists when it was formed in 1984. Plaintiff's membership on the task force was reported in the Minneapolis Tribune. App. 5.

In November 1984, plaintiff testified in a public hearing before the Health and Human Services Committee of the Minnesota State Senate investigating the Board's handling of patient complaints of sexual abuse. App. 7 (tape recording of testimony). Her testimony before the committee was reported in an article in the St. Paul Pioneer Press. App. 6. Plaintiff again spoke publicly about her experiences in June 1986 when she appeared before a national conference held in Minneapolis on the subject of sexual exploitation by therapists. Plaintiff's statements before the conference were reported in two separate articles in the Minneapolis Tribune. App. 8, 9. Plaintiff's name was not mentioned in these articles.

In March 1987, Dreifus contracted with Conde Nast to write an article on the subject of patient-therapist sex for publication in *Glamour*. App. 17. While researching the article, Dreifus learned that Minneapolis had a unique center that specialized in counseling victims of sexual abuse by therapists: The Walk–In Counseling Center. Dreifus contacted two of the center's staff members who scheduled a series of interviews for Dreifus, including an interview with plaintiff. Deposition of Claudia Dreifus at 14–16 (App. 10).

Plaintiff claims that, upon being introduced to Dreifus, she told Dreifus that she was willing to be interviewed "only if I not be identified or identifiable." Deposition of Jill Ruzicka at 36 (App. 11). Plaintiff claims to have mentioned that she had just started a new job and was therefore particularly concerned about confidentiality. *Id.* Plaintiff states that Dreifus agreed to her condition. *Id.*

According to Dreifus, plaintiff "wanted some kind of masking," but "was very casual about it." Dreifus Dep. at 24 (App. 10). Dreifus understood plaintiff's principle concern to be that her new colleagues not identify her from the article. *Id.*

With a single exception, plaintiff did not specify what information would threaten her anonymity. At one point during the interview, plaintiff described some problems she had at one of her previous jobs. Ruzicka Dep. at 37–38 (App. 11). She then said that she did not want that information

in the article "because it would identify me." *Id.*[1]

Plaintiff provided Dreifus with extensive and detailed information about her experience of therapist abuse. Dreifus later decided to use plaintiff's experience as one of two case histories described in the published article. In August 1987, Dreifus called plaintiff and read her a draft of the article. Ruzicka Dep. at 37, 42 (App. 11). Dreifus, however, told plaintiff that she would be rewriting the article at the request of her editors. *Id.* Plaintiff claims that at that point Dreifus asked to use plaintiff's name. Plaintiff answered by saying no and reminding Dreifus that she did not want to be identified or identifiable. Ruzicka Dep. at 37 (App. 11).

There is no evidence that the *Glamour* employees who edited Dreifus' article had any knowledge of plaintiff's request for anonymity, beyond knowing that Dreifus had changed the names of the persons whose experiences were described and that the article concerned a sensitive subject. Dreifus Dep. at 25, 62 (App. 10); Deposition of Rona B. Cherry at 29–30 (App. 12); Deposition of Linda Barbara Peterson at 9 (App. 13); Deposition of Kaye Neil Noble at 7 (App. 14). *Glamour*'s editors trusted that Dreifus would take care of any confidentiality concerns that existed. Cherry Dep. at 101 (App. 12).

Dreifus' editors reviewed Dreifus' first draft and returned it to her with comments. The second draft was accepted, edited, sent through fact-checking and published in the September 1988 issue of the magazine.

In the article, plaintiff is given the name "Jill Lundquist"—a pseudonym that uses her real first name. App. 15. The article describes the plaintiff's experience of abuse, and states that plaintiff filed a complaint with the State Board of Medical Examiners and subsequently sued the psychiatrist. It further states that plaintiff attended law school after the suit settled, that she is now a Minneapolis attorney and that she served on a state task force which helped draft a statute, enacted in 1985, criminalizing therapist-patient sex. Plaintiff is portrayed as someone who successfully recovered from an exploitative situation.

Plaintiff does not know anyone who identified her from the article, except for two former therapists of hers. Affidavit of Jill Ruzicka ¶ 11 and Supplemental Response to Interrogatory 6 (Exh. C to Plaintiff's Memorandum of Law). Both of the former therapists had extensive prior knowledge of plaintiff's history of abuse and other background data. Plaintiff's Answers to Interrogatories—Set I (Exh. C to Defendant's Reply Brief).

On October 21, 1988, plaintiff filed her complaint alleging (1) breach of contract; (2) fraudulent misrepresentation; (3) invasion of privacy by publication of private facts; (4) false light invasion of privacy; (5) intentional infliction of emotional distress; and (6) unjust enrichment. Plaintiff also seeks punitive damages.

## DISCUSSION

Defendants move for summary judgment against all of plaintiff's claims. The arguments on five of the six claims are simple and straightforward, but the questions raised by plaintiff's breach of contract claim are both interesting and difficult. Those questions will be addressed first.

### I. *Breach of Contract*

#### A. *Background*

Beginning in 1964 with *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the law of defamation has been rewritten in order to protect the constitutional rights of free speech and a free press. In order to balance the individual's interest in protecting his or her reputation and "the principle that debate on public issues should be uninhibited, robust, and wide-open," 376 U.S. at 270, 84 S.Ct. at 720, the Supreme Court has "constitutionalized" the law of defamation.

---

**1.** Dreifus states that she did not include this information in the article because of plaintiff's request. Dreifus Dep. at 38 (App. 10).

Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury.... In our continuing effort to define the proper accommodation between these competing concerns, we have been especially anxious to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise. To that end this Court has extended a measure of strategic protection to defamatory falsehood.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974) (citations omitted).

The common law of defamation has been altered by the elimination of strict liability, a shift in the burden of proving the truth or falsity of the allegedly defamatory statement, the requirement that actual malice be proven with convincing clarity whenever the plaintiff is a public official or a public figure, the replacement of the privilege of fair comment with an absolute constitutional privilege for statements of opinion, and restrictions on the recovery of presumed and punitive damages. Moreover, because these constitutional protections are inextricably linked with questions of fact, the courts are empowered to "make an independent examination of the whole record"

to ensure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *Sullivan*, 376 U.S. at 284–86, 84 S.Ct. at 728–29; *see also Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984). Other causes of action which may also impinge on the rights of free speech and free press have been "constitutionalized" in a similar fashion. *See, e.g., Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (intentional infliction of emotional distress); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (prosecution under state statute to protect confidentiality of juvenile proceedings); *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (action under state statute creating remedy for publication of names, pictures or portraits without subject's consent); *Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir.1975) (common law invasion of privacy), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976).

Plaintiff asserts a claim for breach of contract. Few courts have examined whether protections similar to those listed above are accorded media defendants in contract claims.[2] There is, however, one

---

**2.** Besides *Cohen v. Cowles Media Co.*, 445 N.W.2d 248, (Minn.Ct.App.1989), which is discussed in the text following this footnote, apparently only five cases involving breach of a reporter's confidentiality agreement have been reported.

*Doe v. American Broadcasting Companies*, 152 A.D.2d 482, 543 N.Y.S.2d 455 (1st Dept.), *appeal dismissed*, 74 N.Y.2d 945, 550 N.Y.S.2d 278, 549 N.E.2d 480 (1989), was brought by two rape victims who were interviewed by a television station. Before the plaintiffs agreed to be interviewed, they were assured by station employees that the sound and picture would be altered to protect their anonymity. Despite these assurances, plaintiffs were recognizable in the interview as broadcast. On appeal from the trial court's denial of defendants' motion for summary judgment on plaintiffs' claims for breach of contract, negligence and intentional infliction of emotional harm, the appellate court allowed the breach of contract and negligence claims to proceed without discussion. The claim for intentional infliction of emotional harm was dismissed.

In *Virelli v. Goodson–Todman Enterprises, Ltd.*, 142 A.D.2d 479, 536 N.Y.S.2d 571 (3d Dept. 1989), father and daughter plaintiffs agreed to be interviewed about the daughter's drug problem. The reporter was alleged to have promised plaintiffs anonymity and also to have promised the father the right to review the article before publication. Plaintiffs advanced a claim for "tortious breach of confidence," specifically that the article reported facts which revealed plaintiffs' identities. 536 N.Y.S.2d at 575. The court held that same rationale which justified protection for media defendants in defamation actions applied to plaintiffs' cause of action.

[T]he "chilling effect" of the threat of liability will result in media self-censorship "antithetical to the First Amendment's protection of true speech on matters of public concern."

536 N.Y.S.2d at 576, *quoting Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986). The court dismissed plaintiffs' claim for failure to allege a level of culpability consistent with the protections provided to media defendants under New York law. 536 N.Y.S.2d at 576–77.

case very much on point from the jurisdiction whose law governs this action, *Cohen v. Cowles Media Co.*, 445 N.W.2d 248 (Minn.Ct.App.1989), *pet. for review granted*, Oct. 31, 1989. The plaintiff in that case, Dan Cohen, was the director of public relations for the agency handling the advertising for the Independent–Republican gubernatorial candidate in 1983. Six days before the election, Cohen was assigned the task of providing reporters with records documenting a twelve-year-old shoplifting conviction against the Democratic–Farmer–Labor candidate for lieutenant governor. Cohen provided the information to four reporters after obtaining a promise from each reporter that he would not be identified as the source of the information. The editors of two newspapers, the Minneapolis Star–Tribune and the St. Paul Pioneer Press–Dispatch, deliberately reneged on their reporters' promise to Cohen. Those newspapers published stories about the conviction which named Cohen as the source of the information.

There was no dispute that a promise of complete confidentiality had been made and that the promise had been knowingly violated. At the trial of Cohen's claims for breach of contract and misrepresentation, the jury awarded Cohen $200,000 in compensatory damages and $500,000 in punitive damages. The newspapers appealed

and the Minnesota Court of Appeals held that: (1) Cohen's claim for breach of contract did not implicate first amendment concerns because no state action was present; (2) even assuming the existence of state action, the first amendment did not shield the media from liability for the breach of contracts entered into for the purpose of gathering news; (3) a source has a right to enforce a confidentiality agreement through an action for breach of contract; (4) the reporters' promise of confidentiality served to waive any first amendment rights the newspapers may have had in identifying Cohen as the source of the information; and (5) judgment notwithstanding the verdict would be granted on Cohen's misrepresentation claim, because there was no evidence of material misrepresentations.

The Minnesota Supreme Court has heard oral argument in the appeal of *Cohen.* This Court is, of course, bound by the determinations of the Minnesota courts regarding state common law and the state constitution. *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940). The Court is, however, obligated to make an independent determination as to the effect of the United States Constitution. *Cooper v. Aaron*, 358

---

*Huskey v. National Broadcasting Co.*, 632 F.Supp. 1282 (N.D.Ill.1986) stemmed from the visit of an NBC camera crew to the United States penitentiary in Marion, Illinois. Prior to the visit, NBC had entered a contract agreeing to abide by the applicable federal regulations, including a regulation prohibiting the photographing of inmates without their consent. During the visit, however, an NBC cameraman filmed plaintiff.

Plaintiff sued for invasion of privacy and breach of contract. In its motion to dismiss, defendant did not raise any first amendment defenses to the contract claim. The district court held that plaintiff had stated a claim for both invasion of privacy and breach of contract.

*Bindrim v. Mitchell,* 92 Cal.App.3d 61, 155 Cal.Rptr. 29 (2d Dist.), *cert. denied,* 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979) involved a writer who attended a nude group therapy workshop after signing an agreement not to write articles or in any way disclose what happened at the workshop. Shortly after the workshop, the writer wrote a novel depicting a nude encounter session. The psychologist who led

the workshop attended by the writer alleged that the depiction constituted defamation and a breach of contract.

After the jury returned verdicts for the psychologist on both counts, the trial court granted a remittitur on the defamation claim and struck the verdict on the contract claim. Both parties appealed. The court of appeals affirmed the decision to strike the verdict for breach of contract. It held that, despite the parties' agreement, the writer was free to report on what happened in the course of her therapy subject only to the limits of libel law. 155 Cal.Rptr. at 41.

Finally, in *Cullen v. Grove Press, Inc.,* 276 F.Supp. 727 (S.D.N.Y.1967), four correctional officers who were filmed as part of a documentary sued the film's distributors contending, among other things, breach of an agreement not to photograph the lower extremities of the inmates and to exhibit the film only for "educational purposes." The court, without elaboration, rejected any claim based on the alleged agreement as inconsistent with the first amendment. 276 F.Supp. at 731.

U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958).

### B. *Do Suits for the Breach of a Reporter–Source Agreement Implicate the First Amendment?*

■ A three-step analysis is necessary to determine whether the first amendment provides media defendants with protection against suits for breach of a confidentiality agreement. (1) Because the Bill of Rights only provides protection against the actions of the government, the first step is to determine whether any state action is present. (2) If it is present, the Court must then determine whether, by entering into the confidentiality agreement, the media defendant waived its first amendment rights. (3) Only if the answer to that question is in the negative will the Court proceed to balance the competing interests in order to determine what protection, if any, is provided by the first amendment.

#### 1. State Action

■ The "constitutionalization" of defamation and related torts derives from the Supreme Court's determination in *New York Times v. Sullivan* that the adjudication and enforcement of defamation claims between a plaintiff and a media defendant involve state action and thus implicate the first amendment. Because, for the purposes of state action, there is no meaningful difference between the contract action brought here and an action for defamation, the Court is compelled to find state action in this case.

*New York Times* had its genesis in a suit by L.B. Sullivan, a city commissioner for Montgomery, Alabama, against the New York Times Company and four individuals. Sullivan claimed he was defamed by an advertisement carried in the Times appealing for funds to support the civil rights movement. The case was tried under the common law of Alabama and Sullivan won damages of $500,000. The verdict was affirmed by the Alabama Supreme Court.

The issue before the Supreme Court was whether Alabama's defamation law was constitutionally deficient because it did not sufficiently safeguard freedom of speech and press. Sullivan argued that the case was a dispute between two private parties and that the Constitution did not afford protection against private action. The Court rejected that argument.

Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.

376 U.S. at 265, 84 S.Ct. at 718 (citations omitted).

This case is in all relevant respects identical to *New York Times*. It is a case between two private parties, one seeking damages from the other for statements made in the press. The issue presented is whether, and to what extent, civil damages should be available for publication of information in alleged violation of a contract. The constitutional protections accorded speech and the press may limit the ability of the injured party to secure a remedy through the courts. The differences between tort and contract law do not justify a different result in this case. As the dissent in *Cohen* points out, a suit for breach of a reporter-source agreement is not "a regular contract claim." 445 N.W.2d at 263. The contract here is "a pledge not to exercise press freedom." *Id.* The use of the courts to enforce such contracts inherently affects the exercise of free speech and press.[3] As the Supreme Court stated in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986):

---

**3.** The Minnesota Court of Appeals recognized in *Cohen* that court action can constitute state ac-

tion in some circumstances. 445 N.W.2d at 255.

It is not immediately apparent from the text of the First Amendment, which by its terms applies only to governmental action, that a similar result should obtain here: a suit by a private party is obviously quite different from the government's direct enforcement of its own laws. Nonetheless, the need to encourage debate on public issues that concerned the Court in the governmental-restriction cases is of concern in a similar manner in this case involving a private suit for damages: placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result.

In conclusion, the Court finds that state action is present in this case.

### 2. Waiver

The next issue is whether the media defendant waived its first amendment rights by entering the contract. In his plurality opinion in *Curtis Publishing Co. v. Butts*, Justice Harlan described freedom of speech as the " 'matrix, the indispensable condition, of nearly every other form of freedom.' " 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967), *quoting Palko v. Connecticut*, 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). He declared that a waiver of that right would not be found "in circumstances which fall short of being clear and compelling." 388

U.S. at 145, 87 S.Ct. at 1986. *Butts* did not involve a claim of waiver based on contract, but several other cases have discussed the contractual waiver of first amendment rights.[4] The most helpful of these is a decision from the United States Court of Appeals for the Third Circuit, *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084 (3d Cir.1988). That case involved a suit by a cable operator which claimed that its franchise agreement with the City of Erie violated the first amendment.[5] The cable operator had, however, signed a release of any and all claims against the city as part of a settlement of prior litigation which had also involved a first amendment claim. The issue before the court of appeals was whether the release constituted a contractual waiver of the cable operator's right to assert a first amendment challenge to the franchise agreement. 853 F.2d at 1094. The Third Circuit analyzed Supreme Court precedent governing the waiver of procedural and due process rights to answer this question. Two cases were central to this analysis: *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), and *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

Both of those cases considered whether a purchaser had waived right to notice and hearing prior to repossession of certain property, or the entry of judgment by the seller should the purchaser fail to make

---

4. In addition to the cases discussed in the text, the following federal court decisions have discussed the contractual waiver of first amendment rights. *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 663 F.2d 686 (6th Cir.1981) (restaurant operator found not to have waived its right to use offensive name when operator included agreement not to use that name in amended site plan proposal); *United States v. Snepp*, 595 F.2d 926 (4th Cir.1979) (first amendment would prevent enforcement of secrecy agreement to extent it purported to prevent disclosure of unclassified information), *reversed on other grounds*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980); *United States v. Marchetti*, 466 F.2d 1309 (4th Cir.) (same), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972); *Karetnikova v. Trustees of Emerson College*, 725 F.Supp. 73, 81 (D.Mass.1989) (restrictions on speech of college professor not determined by collective bargaining agreement alone "but in

light of the values of safeguarding robust speech in the marketplace generally, and in the academic setting in particular"); *Writers Guild of America, West, Inc. v. FCC*, 423 F.Supp. 1064, 1144 n. 133 (C.D.Cal.1976) (language in contracts delegating programming authority to network board could not be construed as a waiver of first amendment rights and such a construction would, in any event, be an unenforceable violation of public policy), *judgment vacated on other grounds*, 609 F.2d 355 (9th Cir.1979), *cert. denied*, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980).

5. Very briefly, the cable operator argued that the franchise fees and access requirements imposed by contract impermissibly restrained its exercise of free speech and press. 853 F.2d at 1089. *See also Erie Telecommunications, Inc. v. City of Erie*, 659 F.Supp. 580, 593–94 (W.D.Pa. 1987).

installment payments. *Overmyer* involved a contract with a cognovit provision. The contract was negotiated by two corporations with equal bargaining power, each assisted by counsel. 405 U.S. at 180, 92 S.Ct. at 779. The purchasing corporation was aware of the significance of the cognovit provision. 405 U.S. at 186, 92 S.Ct. at 782. The Supreme Court held that procedural due process rights could be contractually waived by a party which "voluntarily, intelligently, and knowingly waived the rights it otherwise possessed to prejudgment notice and hearing, and that ... did so with full awareness of the legal consequences." 405 U.S. at 187, 92 S.Ct. at 783.

In *Fuentes*, a different result obtained. The appellants in the consolidated cases were generally persons who bought household goods under purchase agreements calling for monthly payments. Under the terms of the contracts, title for the goods remained with the seller but the buyer had a right to possession absent a default on the installment payments. The appellants had either fallen behind in their payments or refused to make payments because of a dispute with the seller. The sellers then seized the goods through a writ of replevin obtained under summary procedures provided by state law. The Supreme Court, in reversing the lower courts, found the summary state procedures unconstitutional as a violation of due process. It subsequently turned to the sellers' claim that the contracts, each of which provided for repossession in the event of a default in any payment, constituted a waiver of the appellants' right to procedural due process. The Court held that there was no waiver. It noted that the parties were far from equal in bargaining power and that there was, in fact, no bargaining over the contractual terms between the parties. 407 U.S. at 95, 92 S.Ct. at 2001. There was no showing that the appellants "were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights." *Id.*

The Court continued,

[A] waiver of constitutional rights in any context must, at the very *least*, be clear....

The conditional sales contracts here simply provided that upon a default the seller "may take back," "may retake" or "may repossess" merchandise. The contracts included nothing about the waiver of a prior hearing. They did not indicate *how* or *through what process* ... the seller could take back the goods. Rather, the purported waiver provisions here are no more than a statement of the seller's right to repossession upon occurrence of certain events.

407 U.S. at 95–96, 92 S.Ct. at 2001–02.

The Third Circuit in *Erie* found that *Overmyer* and *Fuentes*, taken together, stood for the proposition that constitutional rights "may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver." 853 F.2d at 1096. The court held that the release executed by the cable operator was a valid contractual waiver of its first amendment rights. "The language of the release is clear and unambiguous and was obviously meant to put an end to all disputes ... arising out of the franchise agreement, including those of constitutional dimension." 853 F.2d at 1097. It noted that the cable operator was familiar with litigation, had the benefit of counsel and received substantial benefits in exchange for the execution of the release. *Id.*

■ To repeat, the test for a waiver of constitutional rights, as summarized by *Erie Telecommunications*, is whether "the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver." 853 F.2d at 1096. Among the facts and circumstances examined are the language of the purported waiver, the sophistication of the parties, the balance of bargaining power, and whether the parties received advice from counsel.

In *Cohen*, the Minnesota Court of Appeals held that the reporters who gave

Cohen a pledge of confidentiality effectively waived their newspapers' first amendment rights. This finding was based on the fact that the reporters were experienced journalists who had given such pledges for many years prior to the incident with Cohen. The court also noted that the reporters knew of Cohen's prominence and therefore realized that by agreeing not to publish his name they "were waiving the right to publish a potentially newsworthy item in return for obtaining another potentially newsworthy item from Cohen." 445 N.W.2d at 258. The dissent argued that, at least as to the right to publish "true information about public affairs," no waiver should be enforced.[6] 445 N.W.2d at 267.

This case does not present the stark choice presented in *Cohen*.[7] In *Cohen*, the terms of the purported waiver seem clear. The reporters agreed not to publish the fact that Cohen was the source of the information concerning the candidate for lieutenant governor. 445 N.W.2d at 252. In the instant case, the author is alleged to have agreed not to identify plaintiff or make her "identifiable." Plaintiff was not identified. Plaintiff can only claim that the information published in the article made her "identifiable."

Just what will make a private figure identifiable depends on the information known by that person's friends and acquaintances. A reporter, for the most part, cannot know what information will threaten the anonymity of a source, unless the source specifies what facts should not be published.[8]

■■■ The Court has concluded that, to the extent there was an agreement not to make the plaintiff identifiable, that agreement is too vague to constitute a waiver of the defendants' first amendment rights. For an agreement to constitute a waiver of constitutional rights, the effect of the waiver must be clear. *See Fuentes*, 407 U.S. at 95–96, 92 S.Ct. at 2001–02. An open-ended term such as "identifiable" provided too little guidance to the defendants about the extent to which they might be held to have waived their first amendment right to publish. The Court holds that, at least under the circumstances here, the agreement must specify the information which is not to be published in order for the waiver to be effective.[9] *Accord, National Polymer Products, Inc. v. Borg–Warner Corp.*, 641 F.2d 418, 423–24 (6th Cir.1981) (refusing to find waiver of first amendment rights in consent to language of protective order because of ambiguity in whether order extended to information disclosed at trial).

In sum, the Court concludes that the media defendant did not waive its first amendment rights under the contract at issue here.

### 3. The Protection Afforded by the First Amendment

Given that there is state action implicating the first amendment and that the contract did not constitute a waiver of defendant's first amendment rights, the next issue to be resolved is what protection, if any, the first amendment affords media defendants in suits for breach of reporter-source agreements. Resolution of this question requires a balancing of the interests underlying the state law of contracts and the interests protected by the free speech and press clauses of the first amendment. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 757–58, 105 S.Ct. 2939, 2945–46, 86 L.Ed.2d

---

6. "[F]reedom of the press is everyone's right, not belonging alone to the editor and publisher. How can the law attribute to the press the capacity to waive a right which is not its own?" 445 N.W.2d at 267.

7. As a result, this Court does not have occasion to decide whether, as the dissent in *Cohen* argues, the requirements for the waiver of first amendment rights should be stricter than those announced in *Erie*.

8. Plaintiff did, in fact, request that the article not contain information about her previous job and that request was honored by Dreifus. Dreifus Dep. at 37–38 (App. 10).

9. The Court realizes there may be circumstances, not present here, in which the reporter must be held to have known that publication of certain information would identify a source and that no specific direction not to publish would be necessary.

593 (1985); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347–48, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974).

This balancing must be informed by an understanding of the practical operation of reporter-source agreements. Confidential sources are a regular, indeed an essential, component of news gathering. *Zerilli v. Smith,* 656 F.2d 705, 711 (D.C.Cir.1981); Langley & Levine, *Branzburg Revisited: Confidential Sources and First Amendment Values,* 57 Geo.Wash.L.Rev. 13, 25–26 (1988); Osborn, *The Reporter's Confidentiality Privileges: Updating the Empirical Evidence after a Decade of Subpoenas,* 17 Colum.Hum.Rts.L.Rev. 57, 73–74 (1985). Confidential sources are used in reporting on almost all news areas. However, such sources are relied on most heavily in reporting about government and its operations.[10] Langley & Levine, *Branzburg Revisited, supra,* at 25–30; Osborn, *supra* at 73–74. The most obvious use of confidential sources is for "not-for-attribution" quotations that convey information or opinions that would not have been made available to the journalist if the source had to be identified. Blasi, *The Newsman's Privileges: An Empirical Study,* 70 Mich. L.Rev. 229, 267 (1971). Confidential sources are also used

> for verifying on-the-record statements, providing tips or leads on new stories, persuading editors to give a story more prominence, determining the proper significance or meaning of certain facts and developments, and inducing reticent sources to divulge information by demonstrating to them that they are not the only ones who are talking to reporters.

Osborn, *supra* at 73; *see also* Blasi, *supra* at 245–46.

It is not clear whether potential sources would dry up if reporter-source agreements were unenforceable. Confidential sources often have an interest in making their information public. That interest, and the source's relationship of trust with the reporter, may outweigh the fact that there is no legal remedy for a breach. *See* Blasi, *supra* at 241 (getting source to trust reporter is key to getting candid information). Journalists have an ethical obligation to honor confidentiality agreements with sources. Goodwin, *Groping for Ethics in Journalism* 129–31. In a number of famous cases, journalists have suffered legal sanctions to protect their sources. *See Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Marcus, *The Reporter's Privilege: An Analysis of the Common Law, Branzburg v. Hayes, and Recent Statutory Developments,* 25 Ariz. L.Rev. 815, 817–18 (1983) (listing examples).

Reporter-source agreements do get breached, however. Some commentators believe that these breaches are becoming more common. Langley & Levine, *Broken Promises,* Colum. Journalism Rev. (July/Aug.1988) 21, 21–22. Such breaches may cause significant damage to the sources. "Their status in the community, their careers, perhaps even their lives" may be at risk. Foreman, *Confidential Sources: Testing the Readers' Confidence,* 10 Soc.Res.: Bus., Journalism, L.Med. 24, 27 (1984). In addition, there may be societal costs to these breaches as well. *See Cohen,* 445 N.W.2d at 257 (sources will not be willing to rely on reporters' promises of confidentiality if no remedy exists for breach); Langley & Levine, *Broken Promises, supra* at 24 (as sources are identified the argument that confidentiality is needed to protect news gathering is undermined).

Actions for breach of reporter-source agreements have their own costs. The agreement is, after all, "an agreement not to publish." *Cohen,* 445 N.W.2d at 263 (Crippen, J., dissenting). The agreement, and any subsequent action to enforce it, necessarily implicates editorial decision-making and, thus, the freedom of the press. The "chilling effect" resulting from the possibility of protracted litigation and large damage awards, recognized by the Supreme Court in defamation actions, is

---

**10.** Government officials are, for their part, "keenly aware of the importance of putting their case before the public through the press, and of cultivating journalists as outlets for anonymous information." Langley & Levine, *Branzburg Revisited, supra,* at 27–28 (footnote omitted).

also present in an action for breach of a reporter-source agreement. Note, *Promises and the Press: First Amendment Limitations on News Source Recovery for Breach of a Confidentiality Agreement*, 73 Minn.L.Rev. 1553, 1576 (1989) [hereinafter *Promises and the Press*]; Note, *Breach of Confidence: An Emerging Tort*, 82 Colum.L.Rev. 1426, 1462 (1982). *See also Virelli v. Goodson–Todman Enterprises, Ltd.*, 142 A.D.2d 479, 536 N.Y. S.2d 571, 576 (3d Dept.1989). This is especially true because reporter-source agreements tend to be oral and indefinite. Note, *Promises and the Press, supra* at 1570–71; Blasi, *supra* at 243. The vagueness of the agreements may often leave uncertainty as to what the terms of the agreement require. Note, *Promises and the Press, supra* at 1570–71. The problems of proof associated with oral contracts can lead to vexatious and expensive litigation. *Id.*

■ How then can the interests served by the common law of contracts be reconciled with the first amendment interests at stake? The Court concludes that, at a minimum, the Constitution requires plaintiffs in contract actions to enforce a reporter-source agreement to prove specific, unambiguous terms and to provide clear and convincing proof that the agreement was breached.

■ The requirement that plaintiff prove the existence of specific, unambiguous terms protects media defendants from litigation concerning the meaning of indefinite agreements. Agreements affecting the exercise of vital first amendment rights should not be enforced if the terms provide

little guidance to the reporters and editors carrying them out or to those charged with interpreting their legal significance. To force media defendants to litigate the meaning of ambiguous terms and subject them to damage awards premised on contracts reasonably susceptible to more than one interpretation will impermissibly chill the exercise of first amendment rights. The Court has no doubt that in balancing the rights of the free press with common contractual rights, the free press rights under the first amendment must be given preference.

■ Further, clear and convincing proof of breach of contract should be required to protect editorial decisions in cases where the plaintiff has alleged and proven the existence of an agreement with specific terms.[11] Occasionally there will be a dispute about whether the publication or broadcast had a particular meaning which would constitute a violation of the agreement. By subjecting plaintiffs to a heightened burden of proof, editorial decisions about content will receive an appropriate margin of protection.[12]

■ The agreement at issue here called upon the reporter not to make the source identifiable in the published article. Plaintiff related a substantial amount of information to Dreifus during the course of their interview. But, with one exception, plaintiff did not specify what particular facts would threaten her anonymity. The Court holds that where the agreement between a reporter and a source requires that the source not be made identifiable, with no further particulars or specific facts about

---

**11.** Given that most reporter-source agreements are informal, oral agreements and that sources cannot be expected to have a sophisticated knowledge of the law, it does not seem appropriate, as defendants suggest, to require clear and convincing proof of the agreement.

**12.** Defendants suggest that the Court borrow the actual malice standard from defamation law and further require the plaintiff to prove that defendants breached the agreement knowingly or through action in reckless disregard of its terms. The author of the Note in the Minnesota Law Review titled *Promises and the Press: First Amendment Limitations on News Source Recovery for Breach of a Confidentiality Agreement*, 73

Minn.L.Rev. 1553, 1580 (1989) makes a similar suggestion—recommending that plaintiffs be required to prove that the breach was made with reckless disregard of the source's interests. Rather than imposing a fault requirement in contract actions, a more appropriate means of protecting good faith decisions to publish may be through the creation of a privilege. *See* Note, *Breach of Confidence: An Emerging Tort*, 82 Colum.L.Rev. 1426, 1466–68 (1982) (breach of confidence cases recognize a privilege for disclosures in the public interest). The facts of this case do not require the Court to address this difficult question, however.

what information would identify the source to the relevant audience, the agreement is too ambiguous to be enforced. Editorial decisions about the information included in an article or broadcast may not be second-guessed in court, unless it is clear what information or facts would cause the source to be identified.

 The plaintiff in this case did specify that information concerning one of her previous jobs would allow her new colleagues to identify her. She asked that the information not be included in the article and Dreifus honored that request. Thus, to the extent plaintiff did detail the information that would make her identifiable, the defendants complied with the agreement. The Court holds that the use by defendants of other particulars and facts given to defendants by plaintiff does not constitute clear and convincing evidence that defendants breached the contract by making plaintiff "identifiable."

On the basis of the analysis above, summary judgment will be granted on plaintiff's contract claim.

## II. Plaintiff's Remaining Claims

 Plaintiff's remaining claims can be disposed of quickly. Plaintiff asserts a claim for fraudulent misrepresentation. As the Minnesota Court of Appeals pointed out in Cohen, a representation must misrepresent a present or past fact to be actionable. 445 N.W.2d at 259. A party who enters into a contract and subsequently fails to perform will be liable for fraud only if the party had no intent to perform at the time the contract was made. Summary judgment will be granted on plaintiff's fraudulent misrepresentation claim because no evidence suggests that Dreifus entered the alleged agreement with an intent to breach it.

 Plaintiff also asserts a claim for intentional infliction of emotional distress. To recover on such a claim a plaintiff must prove: (1) the conduct complained of was extreme and outrageous, (2) it was intentional or reckless, (3) it caused emotional distress, (4) and the distress was severe.

Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438–39 (Minn.1983).

 Plaintiff cannot satisfy the first elements of this test. Conduct is not extreme and outrageous unless it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." Hubbard, 330 N.W.2d at 439, quoting Haagenson v. National Farmers Union Property and Casualty Co., 277 N.W.2d 648, 652 n. 3 (Minn.1979). Defendants' article did not name the plaintiff nor was it written with an intent to breach the ambiguous terms of the agreement. Moreover, virtually all of the information contained in the article had already been made public. Defendants' actions cannot reasonably be found to be extreme and outrageous. Therefore, summary judgment will be granted on plaintiff's claim for intentional infliction of emotional distress.

 Plaintiff also alleges that defendants have been unjustly enriched in violation of her rights. She claims that as a result of the wrongful publication of the article, Conde Nast has received the benefit of substantial revenues from magazine and advertising sales creating a constructive trust of these revenues in her favor. A claim of unjust enrichment requires proof that the defendants received a benefit from the efforts of others and proof that the defendants' enrichment was unjust, "in the sense that 'unjust[ ]' could mean illegal[ ] or unlawful[ ]." First National Bank of St. Paul v. Ramier, 311 N.W.2d 502, 504 (Minn.1981); Iverson v. Fjoslien, 298 Minn. 168, 213 N.W.2d 627, 629 (1973). In cases involving allegations of wrongful publication, a publisher is not held to have received a benefit merely because it referred to plaintiff in a magazine that was published for profit. In such cases, unjust enrichment requires proof of a deliberate association with the defendant's products in an advertising or promotional scheme. Young v. That Was the Week That Was, 312 F.Supp. 1337, 1341–43 (N.D.Ohio 1969), aff'd, 423 F.2d 265 (6th Cir.1970). Plaintiff was not associated with a scheme to advertise or promote defendants' products. Con-

sequently plaintiff cannot establish that defendants received a "benefit" by their use of information about her. Summary judgment will therefore be granted on plaintiff's unjust enrichment claim.

Finally, plaintiff asserts claims for invasion of privacy by publication of private facts and portrayal in a false light. Minnesota has never recognized any cause of action for invasion of privacy. *Stubbs v. North Memorial Medical Center,* 448 N.W.2d 78, 80–81 (Minn.Ct.App.1989), *pet. for review denied,* Jan. 12, 1990; *Hendry v. Conner,* 303 Minn. 317, 226 N.W.2d 921, 923 (1975). Summary judgment will therefore be granted on these claims as well.

Accordingly, based on the foregoing, and upon all the files, records and proceedings in this case,

IT IS ORDERED that defendants' motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.